## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| ADLER MEDICAL, LLC; et al. | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 1-22-cv-00072-KG-LF |
| | ) |
| BLAINE HARRINGTON, III | ) |
| | ) |
| Defendant/Counterclaim Plaintiff | ) |
| Third Party Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| ADLER MEDICAL, LLC; et al. | ) |
| | ) |
| Counterclaim Defendants | ) |
| | ) |
| and | ) |
| | ) |
| CCIM INSTITUTE, | ) |
| | ) |
| Third Party Defendant | ) |

## DECLARATION OF JEFFREY SQUIRES

I, Jeffrey Squire, declare as follows:

1.      I am an attorney, licensed to practice law in New Mexico and qualified to practice in this Court.  I make this Declaration of my personal knowledge, unless otherwise indicated.

2.      I have represented the Plaintiffs/Counterclaim Defendants Adler Medical, LLC ("Adler Medical"), NM CCIM Chapter of the Commercial Investment Real Estate Institute ("NM CCIM Chapter"), Walt Arnold Commercial Brokerage, Inc. (Arnold Brokerage") and Xuan Nation, LLC ("Xuan Nation") throughout the litigation of the above-captioned matter.

3.      At the time I was engaged to represent each of my clients in this matter, they had each received an essentially identical form letter from the attorneys for Defendant/Counterclaim

Plaintiff Blaine Harrington III ("Mr. Harrington") accusing each of them of having infringed a copyrighted photograph (in each instance a different photograph) on their website or social media page; demanding a payment of $30,000 to avoid a lawsuit for infringement; and attaching a draft complaint alleging they had willfully infringed Mr. Harrington's copyright. Each of my clients denied they had any knowledge of Mr. Harrington or his ownership of copyright in any photograph posted on their w    ite or social media; and each expressed deep concern over the accusation of infringement and    c   and for $30,000. Copies of the letter and draft complaints they received were attached as Exhibits to the Complaint ultimately filed in this matter [Doc. 1].

4.      At that time I had some considerable experience in defending claims of copyright infringement either threatened or the subject of lawsuits brought by Mr. Harrington. During the past four years preceding the present matter, I had represented the following parties sued by Mr. Harrington in this Court:  Atlantis CDs, LLC (Case No. 1-18-cv-00044-JCH-SCY); Elevation Counseling, LLC (Case No. 1:18-cv-00045-JWR-KK); and Monica Boehmer, D.D.S., P.C. (Case No. 1-20-cv-01111-LF-JFR).   In one previous instance I had filed a complaint against Mr. Harrington on behalf of Mountain States Agency, LLC, in response to which he filed a counterclaim for infringement (Case No. 1-20-cv-00041-JFR-LF).  In several other instances I had represented individuals or entities who had received demand letters from Mr. Harrington accusing them of infringement, with whom settlements were arranged before lawsuits were filed.

5.      During the period prior to my engagement in the present matter I had conducted investigation of Mr. Harrington's background and litigation conduct; and I had the opportunity to conduct discovery in at least one of the cases listed above.

6.      Mr. Harrington's counsel noticed and took the depositions of each of the Plaintiffs in the instant case during the week of August 8-12, 2022. As stated in his motion (at p. 3) and the

four notices he attached as Exhibit A, he listed 28 topics to be covered in the depositions. Although he served those notices only on August 2, six days in advance of the first day of two depositions to be taken, I did not object. The dates had been previously agreed to. But I was taken aback by the listing of 28 topics, which I believed was excessive. No one who could represent any of my four clients would have knowledge sufficient to answer questions on all those topics. I objected to this, on the record, during Michelle Adler's deposition. See Tr. pp. 7, l. 25-9, l. 25.

7.      In each case, the parties to be deposed designated representatives who would appear to testify, consistent with the requirements of Rule 30(b0(6). In each case the persons so designated were those best able to provide testimony with respect to the topics listed (many of which called for legal knowledge or understanding no corporate representative of a small business could be expected to have). In each case I provided the proposed witness a copy of the notices, and advised them to review the notices and the parties' previous written responses to discovery requests. In each case I met individually face-to-face with the designated witness prior to the deposition, and reviewed previous discovery materials and literally read and discussed each of the topics listed in the notices.

8.      The parties I represent in this case range in size from tiny to small businesses, and one nonprofit association. Adler Medical is a single member LLC operated by Mr. and Mrs. Adler, each trained as nurses, with a few staff employees. Xuan Nation operated a restaurant in a strip mall, owned primarily by Carter Dong, with employees most of whom primarily speak only Chinese (Mr. Dong speaks English as a second language, in which he converses functionally). Arnold Brokerage is a substantial business organization, of which Mr. Arnold is the owner and in charge of its brokerage business. The NM CCIM Chapter is a volunteer not-for-profit membership organization. None of these entities or any persons who could be expected to be designees for the

3

purpose of testifying as representatives, had any personal knowledge of Mr. Harrington or his business practices.  None were lawyers.

9.      Mr. Harrington was scheduled to be deposed on September 28 and 29 in Albuquerque, pursuant to the agreement of counsel reached a month before.   On Saturday September 24, 2022 I received an email from Mr. DeSouza asking me to confer about a motion to disqualify me in the present case, and in all other matters in which I represent parties adverse to Mr. Harrington or another client of Mr. DeSouza's firm, on the ground that I would be a fact witness in those cases.  I responded, suggesting we table any discussion about such a motion until after the deposition of Mr. Harrington took place, but stated I would not agree to withdraw.  See the email exc         .. Exhibit 1 submitted herewithin.  On the following Monday, September 26, Mr. DeSouza filed the motion to disqualify.

10.      Much of the factual information that will support Plaintiffs' claims and defenses in this matter will, unsurprisingly, come from records maintained by, or in the control of, Mr. Harrington, and from records of his conduct in this and other infringement cases he has brought. Such records are found in court files and often available through PACER, as well as from Mr. Harrington himself.  None of this information was known to Plaintiffs in this case.  I have sought such information in discovery, much of which Mr. Harrington has thus far refused to produce, in both this and in other cases in which I represent parties adverse to him.  See, e.g. the motion to compel filed in the matter of <u>Harrington v. 360 ABQ, LLC</u>, Case No. 1-21-cv-00063-KWR-JHR [Doc. 27 in that case], which has been fully briefed and is pending decision.

11.      More pointedly, at his deposition in the present case concluded on September 29, 2022, Mr. Harrington refused in that case to produce any of the documents requested in accordance with Rule 34.  See the Amended Notice of Deposition in that case (which was amended only to

4

change the location where the deposition was to be held), a copy of which is submitted herewith as Exhibit 2. After he was deposed I promptly wrote to his counsel, objecting to Mr. Harrington's refusal to comply with the Rule 34 request, along with his refusal--at his counsel's direction--to produce notes he was reading from in answering questions I posed. See my letter of September 30, 2022, a copy of which is submitted herewith as Exhibit 3. I do not yet have a copy of the transcript of that deposition.

12.    I do not intend to be a fact witness in this or any of the other cases in which I represent parties adverse to Mr. Harrington with respect to his claims for copyright infringement or my clients' claims and defenses. I do not believe I could qualify to be such a witness, as I have no personal direct knowledge of any facts that could be admissible through my testimony.

13.    Mr. Harrington has charged me with sanctionable misconduct during the course of my clients' depositions, and suggests that this would warrant my disqualification. In one instance I was indeed "caught muttering" something under my breath, (as characterized by Mr. Harrington's counsel, see Motion to Disqualify, p. 5, fn. 8). I was wrong to have done so. My "muttering" was my own thoughtless reaction, thinking out loud, without conscious intent, I believe in reaction to what was a period of harassing questioning of Michelle Adler.[1]

14.    Throughout his questioning of Ms. Adler, including the questioning prior to and after my one instance of having "muttered" a few words (not justifiably), Mr. Harrington's counsel was accusatory and argumentative. Ms. Adler was intimidated (Exhibit 4, Tr. p. 134, ll. 13-22) and visibly nervous. Yet she answered all his questions. There is no basis for or suggestion that she did not answer his questions truthfully. I occasionally objected to questions on the basis of

---

[1]  See, e.g., pages 114 through 157 of the transcript of Ms. Adler's testimony, attached hereto as Exhibit 4.

form and/or foundation, but not excessively.  See Exhibit 4; passim.  Harrington's counsel was not

"blocked" from obtaining any information known by the witness that was responsive to proper

questions.  In many instances, including those cited by Harrington's lawyer, I attempted to

encourage the deponents to answer his questions.  See the quoted transcript testimony at pages 6,

8 and 9 of the motion to disqualify.  Only because he kept implying that there was something

improper about Ms. Adler's answers, in response to his repetitive questioning about her reliance

on her lawyer for certain matters of which she had no personal knowledge, did I make the statement

Mr. Harrington's lawyer complained about (motion to disqualify, p. 11) that "Adler Medical, like

all the Plaintiffs in this lawsuit, has relied on its counsel's knowledge of facts that were not

necessarily known to Adler Medical at the time. . .". (Tr. p. 145, ll. 4-7).  That fact would not make

me a witness in this case.  As I there further stated, in response to Mr. DeSouza's question directed

to me, in addition to Plaintiffs, the fact witnesses to be relied on by Plaintiffs would include Mr.

Harrington, and  y would prove their case through him and records that might not be known to

Plaintiffs (Ex. 4,   .  . 145, ll. 12-17).

15.     Mr. Harrington also accuses me of improperly instructing Plaintiffs not to answer

questions about facts I discussed with them on the basis of attorney-client privilege.  I believed

then, and continue to believe, that the contents of my discussions with my clients, including about

facts that we discussed in connection with determining the claims and defenses they would assert,

are privileged.  If they had knowledge from other sources, they would be expected to testify

accordingly.  If they discussed any facts with me in the course of formulating their claims, or

strategies, I believe those conversations are subject to privilege.  My assertion of that privilege was

always in good faith.  When, in connection with my assertion of privilege with respect to my firm's

invoices to Plaintiffs, Judge Fashing instructed/ordered that Ms. Adler (and thus all other

Plaintiffs) should provide such information, I withdrew any objection.

I declare, this 6th day of October, 2022, under penalty of perjury, that the foregoing is to the best of my knowledge true and correct.

Jeffrey L. Squires

EXHIBIT 1

## Jeffrey Squires

| | |
|---|---|
| **From:** | Jeffrey Squires |
| **Sent:** | Saturday, September 24, 2022 5:50 PM |
| **To:** | Daniel DeSouza |
| **Cc:** | Lauren Hausman; James D'Loughy; Toni Jones |
| **Subject:** | RE: Adler v Harrington - meet and confer re forthcoming motion to disqualify |

Dan;

I don't think I need to belabor this. I in fact do know a fair amount about your client and the conduct that gives rise to my clients' claims and defenses—but not anything I could testify about in any of these proceedings. I would be a pretty poor excuse for a lawyer if I hadn't learned something from the past cases in which I have defended a substantial number of clients against threats of litigation and lawsuits he has filed. And the fact that most of my clients in these matters know little about Harrington or his practices is not exactly hot news. But they do know, or believe they know, abusive conduct when they experience it. Fending off efforts to disqualify is, unfortunately, a hazard of the trade. If I were you I might hold back on getting into a disqualification quarrel right now—I haven't yet had the chance to depose Mr. Harrington, and you haven't seen my expert's report. If you want to discuss this, I am happy to do so, but we both have a deposition to prepare for, and other matters as well, so I suggest we table any further discussion, at least until the deposition is over. In any event, I will not shock you. You know I would not agree to withdraw. But I appreciate being given a heads up that you expect to make the effort. It does come as a surprise.

Best,

Jeff

**From:** Daniel DeSouza <dan@copycatlegal.com>
**Sent:** Saturday, September 24, 2022 4:25 PM
**To:** Jeffrey Squires <jsquires@squireslegal.com>
**Cc:** Lauren Hausman <lauren@copycatlegal.com>; James D'Loughy <james@copycatlegal.com>
**Subject:** Adler v Harrington - meet and confer re forthcoming motion to disqualify

Jeff,

While I assume you do not agree (and will discourage me from filing and threaten to seek fees), I am reaching out to confer regarding your position on a forthcoming motion to disqualify you as counsel for Plaintiffs in the Adler v Harrington matter (and in all the other cases in which you have entered an appearance adverse to Harrington). It is our position that you have made yourself a fact witness here – none of your clients has any knowledge about the factual assertions in the Complaint. Each of them referred me to their counsel (you) for the factual basis of their allegations or reiterated that anything they know about those allegations they learned from you. When I asked what knowledge you imparted, I got an instruction not to answer.

Because you appear to be the only person with knowledge about your clients' claims, we think it's improper that you remain as counsel in this case. I'm asking that you voluntarily withdraw so that we can avoid the motion practice. To the extent you disagree, please let me know by end of the day Tuesday (September 27). Happy to discuss with you Monday/Tuesday as well.

- Dan



**Daniel DeSouza**
Partner

Copycat Legal PLLC
3111 North University Drive,
Suite 301
Coral Springs, Florida 33065

**T**  877-HERO-CAT (877-437-6228)
**E**  dan@copycatlegal.com
www.copycatlegal.com

You Create.
Copycat Protects.™



EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| ADLER MEDICAL, LLC; WALT ARNOLD COMMERCIAL BROKERAGE, INC.; XUAN NATION, LLC, AND NM CCIM CHAPTER OF THE COMMERCIAL INVESTMENT REAL ESTATE INSTITUTE<br><br>Plaintiffs,<br><br>vs.<br><br>BLAINE HARRINGTON, III<br><br>        Defendant/Counterclaim Plaintiff<br>        Third Party Plaintiff<br><br>vs.<br><br>ADLER MEDICAL, LLC; WALT ARNOLD COMMERCIAL BROKERAGE, INC.; XUAN NATION, LLC; AND NM CCIM CHAPTER OF THE COMMERCIAL INVESTMENT REAL ESTATE INSTITUTE<br><br>        Counterclaim Defendants<br><br>and<br><br>CCIM INSTITUTE,<br><br>        Third Party Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 1-22-cv-00072-KG-LF<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AMENDED NOTICE OF VIDEOTAPED DEPOSITION TO BLAINE HARRINGTON III

TO:  Blaine Harrington III
c/o:  Daniel DeSouza
      CopyCat Legal, LLC
      3111 N. University Drive
      Suite 301
      Coral Springs, FL  33065
      dan@copycatlegal.com
      james@copycatlegal.com

PLEASE TAKE NOTICE that Plaintiffs in the above-captioned matter will take the oral deposition of Blaine Harrington III on September 28 and 29, 2022, commencing at 9:00 a.m., Mountain Daylight Time and until concluded, at the offices of Williams & Associates, LLC, 317 Commercial St., NE, Albuquerque, NM  87102.  The deposition will be recorded by audiovisual means as provided by Rule 30(b)(3), F.R.C.P.  Pursuant to Rule 34, F.R.C.P., Deponent shall produce documents in response to the document request attached hereto as Exhibit A, at the commencement of his deposition.

Plaintiffs further give notice that this deposition is intended for use at the trial in this matter.

Respectfully submitted,

SQUIRES LEGAL COUNSEL, LLC

By:  /s/ Jeffrey L. Squires
Jeffrey L. Squires
P.O. Box 92845
Albuquerque, NM  87199
Tel:  505-835-5500
Email:  jsquires@squireslegal.com

EXHIBIT A

DOCUMENT REQUESTS

Deponent Blaine Harrington III shall produce the following documents at the commencement of his deposition, in accordance with Rules 26 and 34, F.R.C.P. and further in accord with the Definitions and Instructions set forth in each of Plaintiff's First Request for Production of Documents previously served in this matter.

1.      Documents evidencing any damages you claim to have suffered from the alleged infringements by each of the Plaintiffs/Counterclaim Defendants in the present case.

2.      Documents evidencing any efforts you have made since January 1, 2017 to identify any websites where photographs you had taken were available to the public without notice or attribution of your authorship or claim to copyright ownership.

3.      Documents evidencing correspondence between yourself or your lawyers with any persons you have accused of infringing copyright in your photographs, with respect to infringement claims and/or demands you have made for payment, prior to the initiation of litigation about such claims, since January 1, 2017.

4.      Documents evidencing correspondence between yourself or your lawyers with any persons you have accused of infringing copyright in your photographs, with respect to infringement clair     ·d/or demands you  have made for payment, after the initiation of litigation about such claims  s   ce January 1, 2017.

5.      Documents evidencing the amount paid to you by each person you have threatened with litigation about copyrights in photographs you claim to own, since January 1, 2017, prior to your initiation of litigation over such claims.

6.      Documents evidencing the amount paid to you by each person you have threatened with litigation about copyrights in photographs you claim to own, since January 1, 2017, after your initiation of litigation over such claims.

7.      Documents evidencing any grievance or complaint filed with any court or bar association about you or your attorneys' conduct with respect to litigation you have threatened or instituted in which you alleged copyright infringement of a photograph you had taken, since January 1, 2015.

8.      Documents evidencing any litigation you have initiated in any court since January 1, 2015 that did not involve a claim that copyright in a photograph you had taken was infringed.

9.      Documents evidencing all photos you took of the subject of each of the photographs you claim were infringed by the Counterclaim Defendants in this case, on the day you took each of the photographs that is the subject of your claim against each of the Counterclaim Defendants.

10.     Documents identifying any witness to the actual taking of the photographs that are the subjects of your claims of infringement against each of the counterclaim defendants in this matter.

11.     Documents evidencing any licenses or permissions granted for the use of your photographs by any stock photo agency since January 1, 2017, including the terms of use and payments for use of such photographs.

12.     With respect to any license o permission referenced in the preceding request, an image of the photographs that were the subject of such license or permission.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ADLER MEDICAL, LLC; WALT ARNOLD
COMMERCIAL BROKERAGE, INC.; XUAN
NATION, LLC, AND NM CCIM CHAPTER
OF THE COMMERCIAL INVESTMENT REAL
ESTATE INSTITUTE

              Plaintiffs,

vs.

BLAINE HARRINGTON, III

           Defendant/Counterclaim Plaintiff
           Third Party Plaintiff

vs.

ADLER MEDICAL, LLC; WALT ARNOLD
COMMERCIAL BROKERAGE, INC.; XUAN
NATION, LLC; AND NM CCIM CHAPTER
OF THE COMMERCIAL INVESTMENT REAL
ESTATE INSTITUTE

           Counterclaim Defendants

and

CCIM INSTITUTE,

           Third Party Defendant.

Case No. 1-22-cv-00072-KG-LF

## CERTIFICATE OF SERVICE FOR
## AMENDED NOTICE OF VIDEOTAPED DEPOSITION TO BLAINE HARRINGTON III

I hereby certify that on this 7th day of September, 2022, I served a true and correct copy of this Amended Notice of Videotaped Deposition to Blaine Harrington III, along with this Certificate of Service by email, to his counsel:

Daniel DeSouza
James D'Loughy
COPYCAT LEGAL, PLLC
3111 N. University Drive
Suite 301
Coral Springs, FL  33065
Telephone:  (877) 437-6228
Email:  dan@copycatlegal.com
        james@copycatlegal.com

*/s/ Jeffrey Squires*

EXHIBIT 3

SQUIRES LEGAL COUNSEL, LLC

JEFFREY L. SQUIRES

NM, DC, MD, VA, TX BARS
jsquires@squireslegal.com
202-509-4000

P.O. Box 92845
Albuquerque, NM 87199
Tel: 505-835-5500
www.squireslegal.com

September 30, 2022

Via Email:
dan@copycatlegal.com
james@copycatlegal.com

Daniel DeSouza
COPYCAT LEGAL, PLLC
3111 N. University D ive
Suite 301
Coral Springs, .  .   . /65

Re:     Adler Medical et al. v. Harrington, Case No.  1-22-cv-00072-KG-LF
Deposition of Blaine Harrington III

Dear Dan:

I write promptly after the conclusion of Mr. Harrington's deposition.  I request that you comply with certain discovery obligations, including the obligations to comply with the Rule 34 request for documents served with the Notice of his deposition, and requests for certain documents he first mentioned during the course of his deposition, some of which were likely responsive to previous document requests, and all of which fall within the scope of discovery under the Federal Rules.

Initially, Mr. Harrington produced no documents requested in the notice of Deposition, as listed on Exhibit A to that notice.  You did not serve, or give me any kind of notice of objection to those documents.  There is no legitimate justification for the failure.  If you do not promptly advise that you will produce those documents, I will file the requisite motion to compel.  I think it should be needless to say that, once those documents are produced, whether voluntarily or in response to any motion I am required to serve, Mr. Harrington's deposition will be continued to allow me to question him about those documents.

Also, during the course of the deposition, I made a specific request for documents he mentioned during his deposition.  I am writing without the benefit of having access to a transcript of the deposition, based on notes taken, and so there could be additional documents requested that I will bring to your attention once I have had an opportunity to review a transcript.  For the moment, I am requesting the following documents requested during the deposition:

Letter to Daniel DeSouza
September 30, 2022
Page: 2

  1.  Documents evidencing any agreement Mr. Harrington had with an entity he identified as Visit Albuquerque, which hosted him for the Balloon Fiesta in 2012, during which period he allegedly took the photographs that are the subject of his infringement claims in the <u>Adler</u> litigation. This should include evidence of any expenses he incurred in connection with his visit related to his taking of those photographs, whether reimbursed by his host, or not.

  2.  Copies of all licenses Mr. Harrington entered with any other persons regarding the photographs that are the subject of his infringement claims in this lawsuit.

  3.  Any agreement Mr. Harrington had with Bing pursuant to which the photographs that are the subject of this lawsuit were allowed to be posted on Bing's website.

  4.  Records of any takedown notices Mr. Harrington has sent to the hosts of any websites where any photographs he had taken were posted without his consent.

  5.  Records of any reverse image searches conducted by Mr. Harrington with respect to the photographs that are the subject of his infringement claims in the <u>Adler</u> lawsuit.

  6.  A settlement agreement Mr. Harrington entered with the International Spy Museum in connection with a complaint for infringement he brought against that entity.

  7.  Any license or settlement agreement Mr. Harrington entered with North Bay Bravarian in connection with a lawsuit for infringement he brought against that entity.

  8.  Any settlement agreement entered with Color Passport, Inc. in connection with a complaint he filed against that entity for copyright infringement.

  Of course, the fact that I am requesting these last identified settlement agreements does not indicate that I am not also pursuing discovery of all settlement agreements and licenses Mr. Harrington has entered with defendants he has sued for copyright infringement in any other written discovery request.

  Lastly, for now, please produce any notes he referred to during the course of his deposition. As you recall, he was referring to written notes in providing his responses to questions during the deposition. He also, during the previous day of his deposition, referred to notes--not just the one page he acknowledged at the conclusion of Day 2. I asked to see the notes he was reading from. At the conclusion of his deposition you objected and instructed him not to produce those notes to me at that time. Your objection precipitated a brief argument, but as I said I was not about to physically commandeer Mr. Harrington's notes. Your direction to him that he provide his notes to you, and that you would then consider whether to produce them, was blatantly improper. To be clear, I want all the notes he referred to during his deposition. As appropriate I will bring this to the attention of the Court.

Letter to Daniel DeSouza
September 30, 2022
Page: 3


      There are other issues raised by Mr. Harrington's responses, and your objections based on privilege, which I will address separately at another time.

                 Sincerely,

                 Jeffrey L. Squires

JLS/tj

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ADLER MEDICAL, LLC, WALT ARNOLD COMMERCIAL
BROKERAGE, INC., XUAN NATION, LLC, and NM CCIM
CHAPTER OF THE COMMERCIAL INVESTMENT REAL ESTATE
INSTITUTE,

       Plaintiffs,

v.          Case No. 1:22-cv-00072-KG-LF

BLAINE HARRINGTON III,

       Defendant.

_____

BLAINE HARRINGTON III,

       Third-Party Plaintiff,

v.

CCIM INSTITUTE,

       Third-Party Defendant,

_____

BLAINE HARRINGTON III,

       Counter-Plaintiff,

v.

ADLER MEDICAL, LLC, WALT ARNOLD COMMERCIAL
BROKERAGE, INC., XUAN NATION, LLC, and NM CCIM
CHAPTER OF THE COMMERCIAL INVESTMENT
REAL ESTATE INSTITUTE,

       Counter-Defendants.

DEPOSITION OF MICHELLE ADLER
August 8, 2022
9:01 a.m.
201 Third Street, Northwest, Suite 1630
Albuquerque, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

2

1  TAKEN BY:  DANIEL DESOUZA
        Attorney for the Defendant/Third-Party
2        Plaintiff
3
   REPORTED BY:  Robin A. Brazil, RPR, NM CCR #154
4        Bean & Associates, Inc.
        Professional Court Reporting Service
5        201 Third Street, Northwest, Suite 1630
        Albuquerque, New Mexico  87102
6
7  (7034N) RAB
8
9
        A P P E A R A N C E S
10
   For the Plaintiffs:
11
   JEFFREY LOUIS SQUIRES
12   SQUIRES LEGAL COUNSEL, LLC
        PO Box 92845
13   Albuquerque, New Mexico  87199
        505.835.5500
14   jsquires@squireslegal.com
15  For the Defendant:
16   DANIEL DESOUZA
        COPYCAT LEGAL, PLLC
17   JAMES D'LOUGHY
        LAUREN HAUSMAN
18   3111 N. University Drive, Suite 301
        Coral Springs, Florida  33065
19   877.437.6228
        dan@copycatlegal.com
20
21
22
23
24
25

3

1        I N D E X
2                    PAGE
3  EXAMINATION OF MICHELLE ADLER
4    By Mr. DeSouza            4
5    By Mr. Squires          195
6  CERTIFICATE OF COMPLETION OF DEPOSITION      197
7  WITNESS SIGNATURE/CORRECTION PAGE       200
8        EXHIBITS FORMALLY MARKED/ADMITTED
9  NUMBER
10   1   Deposition notice            5
11   2   4/13/22 letter          27
12   3   12/30/21 letter          31
13   4   1/6/22 letter          36
14   5   Peacock Law billing          42
15   6   1/10/22 email          57
16   7   2/1/22 email          65
17   8   Website screenshots          66
18   9   Screenshot          92
19  10   Complaint          129
20  11   Answers to admissions          192
21
22
23
24
25

4

1        MICHELLE ADLER,
2  after having been first duly sworn under oath,
3  was questioned and testified as follows:
4        EXAMINATION
5  BY MR. DESOUZA:
6    Q.  Morning.
7    A.  Good morning.
8    Q.  Could you state your name for the record?
9    A.  Michelle Adler.
10    Q.  And, Ms. Adler, are you affiliated with
11  Adler Medical, one of the
12  Plaintiffs/Counterdefendants in this lawsuit?
13    A.  Yes.
14    Q.  What is your role with Adler Medical?
15    A.  I am the chief medical officer.
16    Q.  Is Adler -- actually, back up a little
17  bit.  What's the formal corporate name for Adler
18  Medical?
19    A.  Adler Medical d/b/a Adler Family Practice.
20  Adler Medical, LLC d/b/a Adler Family Practice.
21    Q.  Are you a member of the LLC?
22    A.  No.
23    Q.  Meaning one of the owners, one of the
24  members or owners of the LLC.
25    A.  No.

5

1    Q.  Okay.  Who are the members of Adler
2  Medical?
3    A.  Ethan Adler.
4    Q.  Ethan Adler owns 100 percent of the
5  membership interest?
6    A.  Yes.
7    Q.  And sometimes an LLC will have a manager,
8  the person that's designated to be in control of the
9  LLC.  Is that also Ethan Adler?
10    A.  Yes.
11        (Exhibit 1 marked.)
12    Q.  I'm going to go ahead and put up on the
13  screen, hopefully, what we're going to mark as
14  Exhibit 1 to today's deposition.
15        Is my screen up there for you?  Are you
16  able to see it?
17    A.  Yes.  I'm going to grab my glasses.
18    Q.
19        MR. SQUIRES:  Let me interject.  We have a
20  copy of your Notice of Deposition.
21        MR. DeSOUZA:  Okay.  She can look at it --
22        MR. SQUIRES:  With respect to any other
23  documents, I'm going to object to having you
24  question the witness about documents that we don't
25  have copies of in front of us.

**6**

1    I'm not going to prevent the questioning
2  from going forward, but I'm telling you that I'm
3  objecting to this because I think that not having
4  the document in the hands of the court reporter and
5  physically available to the witness makes it
6  difficult for witness to respond to questions about
7  the document and impossible for the court reporter
8  to be marking the document at the time the
9  deposition is being taken, and I don't think that's
10  proper practice.
11    MR. DeSOUZA:  Okay.  Well, we're all
12  entitled to our opinions.
13    Q.  (By Mr. DeSouza) Ms. Adler, you have a
14  copy -- we're going to mark this document as
15  Exhibit 1 to today's deposition.  Exhibit 1 is a
16  notice of taking deposition of the corporate
17  representative of Adler Medical, LLC.  Do you see
18  that?
19    **A.  Yes.**
20    Q.  Have you ever seen this document before?
21  And you can flip through it.  Let me know when
22  you've had a chance.
23    **A.  Yes, I've seen it before.**
24    Q.  Okay.  When was the first time you saw
25  this document?

**7**

1    **A.  A few days ago.**
2    Q.  Do you understand this is the deposition
3  notice for Adler Medical to testify today?
4    **A.  Yes.**
5    Q.  Have you read the topics that are in this
6  document?  If you scroll to the -- let's see, sixth
7  page, there's a page six at the bottom.  It lists a
8  number of deposition topics, one through 28.  Have
9  you read all of those topics?
10    **A.  Yes.**
11    Q.  Do you understand that you are being
12  designated today to testify on behalf of Adler
13  Medical on all of these topics?
14    **A.  Yes.**
15    Q.  Are you prepared to provide testimony
16  today on all of these topics?
17    **A.  Yes.**
18    Q.  Is there any one of these 28 topics that
19  you're not comfortable providing testimony today
20  on --
21    **A.  No.**
22    Q.  -- that you're not prepared to testify on
23  today?
24    **A.  No.**
25    MR. SQUIRES:  I would insert at this time

**8**

1  that there are topics -- because there are so many
2  topics heading -- that Adler Medical, LLC, may not
3  have -- and I say may.  May not have anyone who
4  would be able to testify in detail about some
5  questions you might ask about one or more of these
6  topics but that Ms. Adler is prepared to testify on
7  behalf of Adler Medical, LLC, to these topics.
8    I would also note --
9    MR. DeSOUZA:  Jeff, hold on.  I'm going to
10  ask, for purposes of moving forward -- because it's
11  going to be a long day if this continues, I'm going
12  to ask that you object to the form of the questions,
13  and you not testify as to what your client is or is
14  not prepared to do or provide notes for your own
15  testimony.
16    If you want me to swear -- hold on.  If
17  you want me to swear you in, I'm happy to do so and
18  take your deposition separately, but I'm not going
19  to tolerate five-minute speeches with your opinions
20  on things or what your client is or is not prepared
21  to do.
22    Let's face the truth here.  I served the
23  deposition notice.  You have not filed any Motion
24  for Protective Order.  You have not sought
25  intervention of the court.  Your client is going to

**9**

1  provide testimony and answers on the topics that are
2  here, and if she doesn't know something, or if
3  there's no Adler representative that knows
4  something, she can indicate to me.  Beyond that, I
5  don't want to have five-minute speeches every time I
6  ask questions.  Let's get that out of the way right
7  at the beginning of the day.
8    If we have to get the magistrate on the
9  phone and start dealing with interjections, we can.
10  We're not going to do that today, Jeff.  It's just
11  not going to happen.
12    MR. SQUIRES:  These are preliminary
13  matters, and there are things to get on the record.
14  I will get them on the record.  You will conduct
15  your deposition.
16    I also note an objection to the fact that
17  you served this Notice of Deposition on me on
18  Tuesday last.  I do not believe that that is
19  reasonable notice, as required under the rules, and
20  that will perhaps affect the conduct of the
21  deposition.
22    I am not objecting to the deposition going
23  forward.  I am not imposing objections yet to any
24  particular questions you might ask.  I am getting
25  these preliminary matters on the record.

58

1   with "just wanted to let you know."
2   A.  Got it.
3   Q.  So let me know when you're ready.
4   A.  I'm ready.
5   Q.  Okay.  Have you ever seen this email
6   before?
7   A.  Yes.
8   Q.  Okay.  Do you recall seeing this email on
9   or around January 10th?
10  A.  I believe so, yes.
11  Q.  Okay.  So you were aware around that time
12  that Harrington        willing to resolve this lawsuit
13  by Adler          ing to him $10,000, correct?
14  A.  Correc
15  Q.  Have you paid more in legal fees than that
16  by now?
17       MR. SQUIRES:  Objection.  Instruct the
18  witness not to answer.  Same reasons.
19  Q.  Has Adler Medical made -- did Adler
20  Medical make any counteroffer to Mr. Harrington's
21  $10,000 demand prior to filing this lawsuit?
22       MR. SQUIRES:  Objection.  Form.
23  Q.  You can answer.
24  A.  I believe we did.
25  Q.  Prior to filing a lawsuit?

59

1   A.  Prior to -- you mean before February 1st?
2   Q.  Correct.
3   A.  I don't remember.
4   Q.  So I can tell you that per this email,
5   Ms. Adler, and just that paragraph that's
6   highlighted, my recollection, I could be wrong, is
7   that Mr. Squires conveyed a $750 offer on behalf of
8   Adler Medical.  Mr. Harrington then made a $10,000
9   demand, and there was no response to that demand
10  prior to the filing of this lawsuit.  Do you dispute
11  that?
12  A.  No.
13  Q.  Do you think that's not true?
14  A.  No, I don't dispute that.
15       MR. SQUIRES:  What was the date of this?
16  Oh, okay.
17       MR. DeSOUZA:  January 10th.
18       MR. SQUIRES:  Okay.
19  Q.  (By Mr. DeSouza)  Why did Adler Medical
20  file this lawsuit rather than attempt to further
21  respond to Mr. Harrington's $10,000 demand?
22       MR. SQUIRES:  Objection.  Attorney-client
23  privilege.  Instruct the witness not to answer.
24  Q.  Well, Ms. Adler, can you answer the
25  question without getting into communications with

60

1   your attorney?
2   A.  I don't --
3   Q.  Is there a reason why Adler Medical did
4   not respond to Mr. Harrington's $10,000 demand that
5   you can tell me without getting into conversations
6   with counsel?
7   A.  I'm going to defer to legal counsel on
8   this one.
9   Q.  You can't defer.  It's your knowledge.
10  Either you have a reason that doesn't involve things
11  that your attorney told you, or you don't.  If you
12  don't, and he instructs you not to answer -- he's
13  instructing you not to answer on the basis of any
14  attorney-client communications, I'm assuming.  If --
15  I could be wrong.
16       MR. SQUIRES:  I've lost the thread.  Do
17  you want to have this question repeated or read
18  back?
19       THE WITNESS:  Yes, please.
20  Q.  Well, let me just repeat the question
21  instead of going back in time here.  Fair?
22  A.  Fair.
23  Q.  Okay.  Ms. Adler, Mr. Harrington made a
24  $10,000 demand on January 10th.  Adler Medical did
25  not respond to that $10,000 demand and instead filed

61

1   this lawsuit on February 1st.  Correct?
2       MR. SQUIRES:  Objection as to form.
3   A.  To the best of my recollection, correct.
4   Q.  My question is, why didn't Adler Medical
5   try to make a counteroffer or otherwise respond to
6   Mr. Adler's $10,000 demand instead of just filing a
7   lawsuit?
8       MR. SQUIRES:  Objection.  Privilege.
9   Q.  Okay.  And my question to you, Ms. Adler,
10  is can you answer that question without conveying
11  the substance of any attorney-client communications?
12  A.  I don't believe I can.
13  Q.  Okay.  Did you ever think maybe you
14  wouldn't be here today if Adler Medical had actually
15  responded to the $10,000 demand?  Has that thought
16  ever crossed your mind?
17       MR. SQUIRES:  Objection.  Form.  That's so
18  improper, Dan.  I'm not going to instruct the
19  witness not to answer, but I'm going to talk.  Your
20  questions of this import are out of line.  Ask facts
21  pertinent to the case, and let's move forward.
22       MR. DeSOUZA:  I appreciate your input,
23  Jeff.  Be quiet, and let her answer the question.
24       MR. SQUIRES:  Thank you.  Ask a proper
25  question.

62

1       MR. DeSOUZA: Jeff, stop talking. For
2 God's sake, this is my deposition, not yours. I
3 don't care about your personal opinions.
4     Q. (By Mr. DeSouza) Ms. Adler, has the
5 thought ever crossed your mind that had you
6 endeavored to respond to Mr. Harrington's $10,000
7 demand, we wouldn't be sitting here today?
8       MR. SQUIRES: Answer. Has the thought
9 crossed your mind?
10    **A. Yes.**
11     Q. Have you had those discussions with your
12 husband?
13    **A. Yes.**
14     Q. Do you feel like you did the right thing
15 by filing the lawsuit instead of trying to negotiate
16 with Mr. Harrington presuit?
17    **A. Yes.**
18     Q. Why is that?
19    **A. I'll have to think about that one for a**
20 **second.**
21     Q. Take your time.
22    **A. Could you repeat the question for me?**
23     **(Record read by the stenographer.)**
24    **A. You said presuit, before the lawsuit?**
25     Q. Yes.

63

1    **A. I didn't hear that part. Mr. DeSouza,**
2 **there was a lot going on at that time. I can't go**
3 **back in time trying to figure out what we should**
4 **have done, should not have done.**
5     Q. Adler Medical has never paid to license
6 any photographs that were displayed on its website,
7 correct?
8    **A. Incorrect.**
9     Q. Okay. As of the time of the demand
10 letter, which was December 30th, 2021, Adler Medical
11 had never paid to license any photographs displayed
12 on its website, correct?
13    **A. Correct.**
14     Q. Okay. Since that time, has Adler Medical
15 paid to license photos?
16    **A. Yes.**
17     Q. From who? From what company?
18    **A. I forgot the company's name, but we do**
19 **have a license.**
20     Q. Is it a stock photo agency, like Getty or
21 Alamy?
22    **A. Yes.**
23     Q. If you think of the name today, please let
24 me know. Okay?
25    **A. Okay.**

64

1       MR. SQUIRES: I don't -- I don't want --
2 I'd like to take a break. It doesn't have to be
3 this second, but in the next few minutes.
4       MR. DeSOUZA: That's fine. We can take a
5 break. Let's take a break.
6       (Recess was taken from 10:21 to 10:31.)
7     Q. (By Mr. DeSouza) Ms. Adler, why is it that
8 Adler Medical Practice did not pay to license any of
9 the photographs on its website prior to
10 December 30th, 2021?
11    **A. Because we just did a random search and --**
12 **on the internet, and we thought it was free.**
13     Q. And I'm not talking about just my client's
14 photo. I'm talking about any photo that was on the
15 website.
16    **A. Internet. Free. Random search.**
17     Q. And why is it that Adler Medical has now
18 paid to license photos that are on its website
19 today?
20    **A. Because we were sued by Mr. Harrington for**
21 **a photo, and out of an abundance of caution, we made**
22 **sure everything was locked down. You made us**
23 **gun-shy.**
24     Q. All right. I'm going to put up on the
25 screen what we've marked as Exhibit 8 to today's

65

1 deposition.
2       MR. SQUIRES: Could you tell me what
3 Exhibit 6 and 7 are and -- because I've lost track.
4 She's shaking her head no, she's not --
5       MR. DeSOUZA: Sure. Exhibit 6 was the
6 DeSouza January 10, 2022, email with the $10,000
7 settlement demand by Harrington. I apologize. I
8 don't think I got into Exhibit 7.
9       MR. SQUIRES: Okay.
10       MR. DeSOUZA: Let me take this down.
11 You're right, Jeff.
12       MR. SQUIRES: That's the first time.
13       MR. DeSOUZA: It is. Let the record be
14 clear. I agree with Jeff for the first time.
15       (Exhibit 7 marked.)
16     Q. (By Mr. DeSouza) Just for the sanctity of
17 the record, Ms. Adler, I am putting up on the screen
18 what I marked as Exhibit 7 to today's deposition.
19 Exhibit 7 is a February 1st, 2022, email from myself
20 to Mr. Squires. It's actually an email chain, the
21 first email of which was a February 1st email from
22 Mr. Squires to me. Do you see that?
23    **A. Yes.**
24     Q. Okay. And all this email chain is,
25 Ms. Adler, is an email from your attorney to me,

118

1  wouldn't have said that if you didn't believe that
2  to be true, correct?
3      A.  Correct.
4      MR. DeSOUZA: Okay.
5      (Discussion off the record at 11:50.)
6      MR. SQUIRES: Okay.
7      Q.  (By Mr. DeSouza) Ms. Adler, nothing
8  physically stopped either you or Ethan from trying
9  to find the author of the photograph at issue,
10 contacting that author, and seeing if you could use
11 the photograph on your website, correct?
12     MR. SQUIRES: Objection as to form.
13     A.  Correct.
14     Q.  No one -- no one put a gun to your head
15 and said, you've got to use this photo, and you
16 can't look into it any further, right?
17     A.  Is that a question?
18     Q.  Yeah, it is.
19     MR. SQUIRES: He asked you if anybody put
20 a gun to your head.
21     A.  No, no one put a gun to our heads.
22     Q.  Do you have any reason to believe that
23 this photograph was not available for license from
24 Mr. Harrington in 2018 when you guys found the
25 photograph?

119

1      MR. SQUIRES: Objection as to form.
2  Foundation.
3      You can answer.
4      A.  Could you repeat the question, please?
5      Q.  Sure.  Do you have any reason to believe
6  that this photograph was not available to be
7  licensed from Mr. Harrington in the 2018 timeframe
8  when you found it via your Google search?
9      A.  No.
10     Q.  Similar to the other 11 photos we looked
11 at before, do you feel -- do you feel a modicum of
12 guilt that you used Mr. Harrington's photograph and
13 never paid for it?
14     MR. SQUIRES: Guilt.  Do you feel guilty?
15 Not your -- you're the subject of a claim in a
16 lawsuit, but do you feel guilty?
17     A.  No.
18     Q.  You used the photograph for five years
19 without paying for it, right?
20     A.  Correct.
21     Q.  If Mr. Harrington charges people to use
22 his photo, be it on an annual basis or in
23 perpetuity, don't you think you should have paid him
24 for the use of his         ?
25     MR. S         : Objection.  Form.

120

1  Foundation.
2      Q.  You can answer.
3      A.  I don't know.
4      Q.  Well, what would lead you to the
5  conclusion that you shouldn't have paid this guy for
6  his photograph in the first place?
7      A.  We felt the photograph was free on the
8  internet.
9      Q.  Well, you were mistaken.
10     MR. SQUIRES: Objection.
11     Q.  If you were mistaken --
12     MR. SQUIRES: Objection.  Don't voice your
13 opinions about that.  Ask a question.  There's no
14 reason to think she was mistaken.  You can argue
15 that she was mistaken or wasn't mistaken, and I can
16 argue the same, but don't tell her she was mistaken.
17     MR. DeSOUZA: Jeff, if I could figure out
18 a way to stop you from giving me your opinion, I'd
19 be more than happy to listen to it, but you've been
20 doing it all day.  I'm sure I'm going to hear it for
21 another five hours in the next deposition.
22     So maybe just be quiet.  I mean, I've
23 tried ten times to ask you that.  It's obviously not
24 going to succeed, but you know, here's to wishful
25 thinking anyway.

121

1      Q.  (By Mr. DeSouza) Ms. Adler, you don't
2  dispute that Mr. Harrington is a professional
3  photographer, do you?
4      A.  I do.  I -- I don't --
5      Q.  You don't -- you don't think he's a
6  photographer who sells his work?
7      A.  I don't know.
8      Q.  I said you don't dispute.  Do you have any
9  reason to believe that he is not a professional
10 photographer who sells or licenses his work?
11     A.  I don't know.
12     Q.  I'm just asking -- like you might be able
13 to tell me, Dan, I had a call with Mr. Harrington,
14 and he told me he's never sold any of his
15 photographs.  He's not really a photographer.
16     I don't know that until I ask you.  I'm
17 asking you, do you have any reason to believe that
18 he is not a professional photographer who sells his
19 work?
20     A.  No.
21     Q.  Okay.  Do you understand that if you had
22 paid for this photo in the first place, you wouldn't
23 be a party to this lawsuit?
24     MR. SQUIRES: Objection.  Form.
25 Foundation.

---

122

1      You can answer.
2      Q.  Do you get that, Ms. Adler?
3      A.  Yes.
4      Q.  Okay.  You told me earlier that Adler
5  Medical offers a suite of different PA-type
6  services, correct?
7      A.  Correct.
8      Q.  And you are the chief medical officer,
9  correct?
10      A.  Correct.
11      Q.  Who handles the accounting for Adler
12  Medical?  Bookkeeping, accounting, making sure
13  you're getting paid, who handles that?
14      A.  Our biller.
15      Q.  Who's the biller?
16      THE WITNESS:  Jeff?
17      Q.  You can't look to Mr. Squires for
18  assistance.
19      MR. SQUIRES:  Tell him.
20      A.  Her name is Lisette.
21      Q.  Is she an employee of the company?
22      A.  No.  She's an independent.
23      Q.  Okay.  Does Adler Medical bill patients
24  directly, or does it deal with insurance or some
25  combination of both?

---

123

1      A.  Combination of both.
2      Q.  Okay.  Did you ever have a patient not pay
3  for your services?
4      A.  Yes.
5      Q.  Services you rendered, and the patient
6  didn't pay for it?
7      A.  Yes.
8      Q.  What did you do about that, if anything?
9      A.  We wrote it off.
10      Q.  Did you ever get upset that you rendered
11  services to someone who decided not to pay you for
12  those services?
13      A.  No.
14      Q.  Does it take money out of Adler Medical's
15  pocket if one of your patients doesn't pay for
16  services you rendered?
17      A.  Yes.
18      Q.  Doesn't upset you at all when a patient
19  does that and doesn't pay?
20      A.  No.
21      Q.  Why is that?
22      A.  I look at the circumstances.
23      Q.  Okay.  What if the patient has the ability
24  to pay, and they just choose not to pay?
25      MR. SQUIRES:  Objection.  Form.

---

124

1  Foundation.
2      Q.  Does that upset you?
3      A.  No.
4      Q.  Make you angry at all?
5      A.  No.
6      Q.  Okay.  Well, what circumstances would you
7  not be happy with a patient not paying you for
8  services that you rendered?
9      A.  I can't think of any right now.
10      Q.  Explain to me how you using
11  Mr. Harrington's photo without his consent or
12  without payment to him is any different than some
13  patient using your services and deciding not to pay
14  for those services.
15      MR. SQUIRES:  Objection.  Form and
16  foundation.
17      Q.  You can answer.
18      MR. SQUIRES:  Yeah, you can answer if
19  you've got an answer for it.
20      A.  I look at the intent.  Most people don't
21  intend on doing something wrong, but it happens.
22      For instance, the patient who doesn't pay,
23  I look at the individual person and their
24  circumstance, see what's going on with that person.
25      Q.  So explain to me, Ms. Adler, how is it any

---

125

1  different when a patient doesn't pay you versus when
2  you didn't pay Mr. Harrington?
3      MR. SQUIRES:  Objection.  Form and
4  foundation.
5      Q.  You're looking at intent?
6      A.  Yes.
7      Q.  What's the difference?  I came to your
8  clinic because my back was hurting, or whatever
9  other service I needed.  Ethan saw me.  He spent an
10  hour of his time with me.  I walked out.  I gave you
11  a bad check, or I just didn't pay you at all.  How
12  is that any different?  You've lost income at that
13  point, correct?
14      A.  Yes, correct.
15      Q.  Okay.  By using Mr. Harrington's photo
16  without paying him, he's lost income, correct?
17      MR. SQUIRES:  Objection.  Form.
18  Foundation.
19      Q.  Right?
20      A.  I don't know if he's lost income.
21      Q.  Well, if he was going to sell you that
22  photo for a dollar, and you didn't pay him that
23  dollar, you'd agree with me he's lost a dollar,
24  right?
25      MR. SQUIRES:  Objection.  Form and

---

126

1  foundation.
2      **A. Right.**
3      Q. Okay. So how is it any different?
4  Patient doesn't pay you, you lost money, right?
5      **A. Yes.**
6      Q. You don't pay Mr. Harrington, he's lost
7  money, right?
8      MR. SQUIRES: Objection. Form.
9  Foundation.
10     Q. You've got to --
11     MR. SQUIRES: She's already answered this.
12  Dan. This is one of the silliest lines of question
13  I've ever heard, but go ahead.
14     MR. DeSOUZA: Jeff, I love your personal
15  opinions, but I got tired of hearing them five
16  months ago.
17     You are costing your clients additional
18  money by refusing to stop talking. Ms. Adler,
19  presumably, and I'm going to get to the information
20  at some point, is paying you for your time, and all
21  you're doing is delaying this out, Jeff. So if you
22  want to save your client some money, maybe stop
23  talking and let me finish my deposition. How about
24  that?
25     MR. SQUIRES: Is there a question pending?

127

1      MR. DeSOUZA: There was a question, but I
2  can't get a word out of my mouth without you
3  deciding to interrupt me.
4      Ms. Court Reporter, can you read back the
5  question, maybe this time without Mr. Squires'
6  flavor?
7      MR. SQUIRES: What if we stipulated
8  something, Dan? What if we stipulated that if
9  Mr. Harrington licensed the photograph, he would be
10  entitled, according to the terms of the license, to
11  be paid for it. If someone used his photograph
12  without paying him for it, if they knew it was his
13  photograph, and if he had not contrived to have them
14  have his photograph available for downloading
15  without notice of his ownership of the photograph --
16     MR. DeSOUZA: How about -- how about we
17  stipulate that I'm going to file a motion to compel
18  and seek sanctions and attorneys fees for your
19  refusal to be quiet and your continuing speaking
20  objections and your continuing insistence that
21  you're going to testify on behalf of your client?
22  Would you like to stipulate to that? If not, be
23  quiet.
24     Madam Court Reporter, please read back the
25  question.

128

1      (Record read by the stenographer.)
2      **A. I don't know.**
3      Q. Ms. Adler, if you go to -- I'm sorry, I'm
4  not familiar with New Mexico. What's a grocery
5  store that you shop at regularly?
6      **A. Sprouts.**
7      Q. I'm sorry, what? Sprouts?
8      **A. Sprouts.**
9      Q. Ever buy milk there, eggs, that type of
10  stuff?
11     **A. Yes.**
12     Q. Okay. If you go to Sprouts, and you take
13  a carton of milk off the shelf, you walk out without
14  paying for it, did you cost them anything?
15     **A. Yes.**
16     Q. Didn't pay for it, right?
17     **A. True.**
18     Q. You should have paid for it, right?
19     **A. But walking into Sprouts, you know you
20  need to pay for the goods.**
21     Q. Okay. So you think as long as you don't
22  know what you were doing, it excuses the fact that
23  you used someone's photograph without paying for it
24  in the first place?
25     **A. Yes.**

129

1      Q. Ms. Adler, I'm going to share my screen
2  with you.
3      **A. Okay.**
4      Q. I believe we're on Exhibit 10.
5      (Exhibit 10 marked.)
6      MR. DeSOUZA: Is that correct, Madam Court
7  Reporter?
8      THE COURT REPORTER: Yes, we're on 10.
9      Q. Ms. Adler, I am showing you what I marked
10  as Exhibit 9 -- I'm sorry, 10 to today's deposition.
11  Exhibit 10 is a copy of the complaint that was filed
12  in this case on February 1st, 2022. Okay?
13     **A. Okay.**
14     Q. Did you have a chance to review this
15  complaint prior to it being filed?
16     **A. I don't remember.**
17     Q. You want me to scroll through? I don't
18  want to be unfair to you.
19     **A. Sure.**
20     Q. You tell me when you want to read, go to
21  the next page, whatever you want to tell me.
22     **A. Next page. Okay.**
23     Q. Do you want me to keep going?
24     MR. SQUIRES: I would ask that the witness
25  now start carefully reading.

130

1    A.  Okay.
2    Q.  Ms. Adler, for the intent to speed this
3  up, I'm not asking you to read word for word.  I'm
4  simply asking if you had a chance to review this
5  complaint prior to it being filed in this lawsuit.
6    MR. SQUIRES:  She's already answered that
7  question.
8    MR. DeSOUZA:  I didn't hear an answer to
9  that.
10    MR. SQUIRES:  She said she didn't
11  remember --
12    THE WITNESS:  Right.
13    MR. SQUIRES:  -- whether she had or not.
14    Q.  (By Mr. DeSouza) Ms. Adler, do you believe
15  by reading this word for word it's going to help you
16  to remember if you read this prior to it being
17  filed?
18    A.  I've read so many things, I don't
19  remember.
20    Q.  I don't want to go through 11 pages if
21  that's not going to help you.  Okay?
22    A.  Okay.
23    MR. SQUIRES:  If you're going to ask her
24  questions about any of this material, I want her to
25  read it carefully.

131

1    Q.  Ms. Adler, you understand that Adler
2  Medical, together with these other Plaintiffs,
3  initiated this federal lawsuit, correct?
4    A.  Correct.
5    Q.  Mr. Harrington sent you a demand letter.
6  Adler Medical, together with its Co-Plaintiffs,
7  decided to file this lawsuit, right?
8    A.  Correct.
9    Q.  You understand that in this lawsuit you
10  were making a series of factual allegations about
11  Mr. Harrington and yourself, correct?
12    A.  Correct.
13    Q.  Is it important to you that allegations
14  that are made in a federal lawsuit are accurate?
15    A.  Yes.
16    Q.  You . . . . .ay something in this
17  complaint that y . . t . lieved to be untrue, correct?
18    A.  Correct.
19    Q.  Were you aware that you're accusing
20  Mr. Harrington of some pretty serious misconduct in
21  this lawsuit?
22    A.  The contentions are outlined in the
23  complaint.  I'll defer to my counsel on that.
24    Q.  Ms. Adler, I need you to understand
25  something.

132

1    A.  Sure.
2    Q.  This complaint -- this complaint is not
3  your lawyer's complaint.  This is a complaint that
4  is filed by Adler Medical, Walt Arnold Commercial
5  Brokerage, Xuan Nation, and NM CCIM Chapter of the
6  something or other.  Do you understand that?
7    A.  Yes.
8    Q.  You cannot defer to your lawyer --
9    MR. SQUIRES:  She knows that.  She'll
10  answer the question.  The question was, does she
11  understand that there were some serious allegations
12  of wrongdoing against Mr. Harrington.
13    Do you understand that?
14    THE WITNESS:  Yes.
15    Q.  (By Mr. DeSouza) Adler Medical would not
16  make those allegations if it was not confident that
17  those allegations were true, right?
18    A.  Correct.
19    Q.  You wouldn't want to put something
20  inaccurate in a federal public record complaint,
21  right?
22    A.  No, not at all.
23    Q.  I want to look at some of those
24  allegations now.  Okay?
25    A.  Okay.

133

1    MR. DeSOUZA:  Jeff, I assume you don't
2  have an actual copy of the complaint, right?
3    MR. SQUIRES:  Not in front of me.
4    MR. DeSOUZA:  I'd just like to know if she
5  was reading from there or reading from here.  I'd
6  like her to read paragraphs starting with --
7    Q.  (By Mr. DeSouza) Ms. Adler, I'm going to
8  put paragraph nine up on the screen, and I've got
9  some yellow highlighting in here.  Do you see that?
10    A.  Yes.
11    Q.  Now, go ahead and read all of paragraph
12  nine.  Don't just read my yellow highlighting.  Just
13  go ahead and read paragraph nine to yourself.  You
14  don't have to read it for everybody.  Let me know
15  when you're ready.
16    A.  Okay.
17    Q.  Now I'm going to focus you on this portion
18  of paragraph nine that begins with the words:
19  Mr. Harrington has pursued a believed-to-be unique
20  business model.  Do you see that?
21    A.  Yes.
22    Q.  Specifically where we say:  He has
23  knowingly allowed his photographs to be available to
24  the public on websites without providing notice that
25  he claims to be the photographer or copyright owner

134

1 of those photographs. Do you see that?
2   A.  Yes.
3   Q.  What is your evidentiary basis for saying
4 that? What's your support for that statement?
5   A.  Well, this is how we got here today,
6 because on the web -- the Google search that we did,
7 there was nothing identifying the picture as
8 belonging to Mr. Harrington.
9   Q.  Ms. Adler, you don't even have a better
10 than 50/50 understanding of what the Google search
11 was in the first place, correct?
12   A.  Okay.
13   Q.  Don't take my word for it. It's your
14 testimony. You told me earlier you don't have a
15 better than 50/50 understanding that it was pictures
16 of Albuquerque or some other search that was run,
17 right?
18   A.  Incorrect.
19   Q.  That's not correct?
20   A.  I was nervous and a little bit
21 intimidated. The Google search that was done said
22 pictures of Albuquerque.
23   Q.  What are the last ten Google searches that
24 you've run, Ms. Adler? Word for word, verbatim.
25   A.  Okay. The last one I did was looking for

135

1 a particular book, has to do with psychology.
2 Before that, I was looking for a pair of shoes,
3 they're Dansko Mary Janes.
4   Q.  Ms. Adler, I'm asking you for the specific
5 words that were used.
6   A.  Okay.
7   Q.  Quote.
8   A.  Danskos Mary Janes, Psychology Now, and
9 before that, I was looking for -- on Etsy for June
10 plumb trees. Before that, I was looking at Etsy for
11 Brazilian hair. Before that, I was looking at
12 Google for, I believe, NMSU graduate studies.
13      Do you want me to keep going?
14   Q.  Those are the exact words that you used?
15   A.  Yes, because those are the things I was
16 looking for.
17   Q.  Okay. And so even though for the other 11
18 photos you told me 50/50 it may have been this, it
19 may have been something else, you've got, what,
20 100 percent confidence that the Google search of our
21 photo in this lawsuit was pictures of Albuquerque?
22   A.  I wouldn't say 100 percent, but I'm sure
23 it said pictures of Albuquerque.
24   Q.  Well, you told me that you guys ran
25 multiple searches, right?

136

1   A.  On different things, yes.
2   Q.  But you know for sure or as close to being
3 sure as you can --
4   A.  Yes.
5   Q.  -- that pictures of Albuquerque is what
6 resulted in you finding the photo at issue in this
7 lawsuit?
8   A.  To the best of my recollection, yes,
9 Mr. DeSouza.
10   Q.  But you don't know which website it was
11 found on, correct? Google doesn't host the photos
12 themselves, right?
13   A.  I'm aware of that.
14   Q.  The photo has to be hosted on some website
15 that Google is displaying on your search results,
16 right?
17   A.  Correct.
18   Q.  And you don't know, or at least you can't
19 tell me under oath, which website Google displayed
20 that photograph on, correct?
21   A.  Correct.
22   Q.  Could have been Mr. Harrington's website
23 similar to the Google search results we were seeing
24 earlier, right?
25   A.  It could have been, but I highly doubt it,

137

1 Mr. DeSouza.
2   Q.  I didn't catch the -- after the could have
3 been, I didn't catch that.
4   A.  I said it could have been.
5   Q.  Then you said something else.
6   A.  I highly doubt it.
7   Q.  Well, certainly today, prepared for this
8 deposition, you cannot point me to the website that
9 that Google search resulted in displaying that you
10 copied the photo from, right?
11   A.  Right.
12   Q.  And that's true for both yourself and
13 Ethan, correct?
14   A.  To the best of my knowledge, correct.
15   Q.  It's not to the best of your personal
16 knowledge. That's one of the topics of today's
17 deposition.
18   A.  Yes.
19   Q.  You are prepared to testify, correct?
20   A.  Correct.
21   Q.  You discussed this matter with Ethan
22 before, right?
23   A.  Right.
24   Q.  Notwithstanding those discussions, as you
25 sit here today, there's not a specific website you

138

1   can point me to on which this photograph was found,
2   correct?
3      A.  No, sir, I cannot.
4      Q.  Okay.  You've never spoken to Blaine
5   Harrington, have you?
6      A.  No.
7      Q.  Prior to receipt of the demand letter, you
8   didn't even know who he was, correct?
9      A.  Correct.
10     Q.  You've never seen any communication from
11  Mr. Harrington where he admits or acknowledges that
12  he puts his photos on websites without any
13  acknowledgment that he's the photographer, right?
14     A.  Right.
15     Q.  So I'm trying to understand what your
16  evidence is, Ms. Adler, because you're making a
17  pretty serious allegation here.  You'd agree with me
18  this is a pretty serious allegation that
19  Mr. Harrington is purposely putting his photos on
20  websites without evidence that he's the author?
21     MR. SQUIRES:  Objection.  Form and
22  foundation.  That's not what the allegation is.
23     Q.  Let's go through it specifically,
24  Ms. Adler.  He has knowingly allowed his photographs
25  to be available on websites without providing notice

139

1   he is the photographer.  Do you see that?
2      MR. SQUIRES:  I point out the distinction
3   between that and what you said.  It does not say he
4   posts them knowingly.  It says he has knowingly
5   allowed them to be posted by others.
6      Q.  Ms. Adler, what's your evidence?  What's
7   your evidence that he's knowingly allowed his
8   photographs to be knowingly available on websites
9   without providing notice that he claims to own the
10  photograph?  Give me the evidence.
11     A.  That's how we got the photograph.  There
12  was nothing identified in the photograph belonging
13  to Mr. Harrington.
14     Q.  Let me ask you this.  Did he knowingly
15  allow the photograph to be on your website, or did
16  he send you a pretty sternly worded letter telling
17  you otherwise?
18     A.  I don't understand.
19     Q.  You say he's knowingly allowed the
20  photographs to be available on websites without
21  providing notice that he claims to own the
22  photograph.
23     A.  Correct.
24     Q.  That ... gati n.  You understand
25  that, right?

140

1      A.  Yes.
2      Q.  Did Mr. Harrington knowingly allow the
3   photograph to be published on your website?
4      A.  I don't know.
5      Q.  Well, the December 30th, 2021, letter you
6   received seems to suggest otherwise, doesn't it?
7      MR. SQUIRES:  Objection.  Form.
8   Foundation.
9      You know, you're getting into an argument
10  with the witness pointlessly, Dan, but you don't
11  like being told that, but it's true.
12     MR. DeSOUZA:  You're right.  I don't like
13  hearing your voice, but yet here we are.
14     Q.  (By Mr. DeSouza) Ms. Adler?
15     A.  Yes.
16     Q.  Can you answer my question?
17     A.  Can you repeat the question?
18     Q.  I wish I could without the interjection of
19  your attorney, so I'll turn to the court reporter
20  and ask Madam Court Reporter to read it back.
21     (Record read by the stenographer.)
22     MR. SQUIRES:  Out of context.  The witness
23  can't understand the question without the previous
24  question.  What is it --
25     Q.  Ms. Adler, can you answer the question or

141

1   not without being coached by your attorney?
2      MR. SQUIRES:  What's the question?
3      Q.  Ms. Adler, can you answer the question?
4   Do you know what the question was?  Without having
5   your attorney chime in and guide you as to an
6   answer, are you able to answer?
7      A.  No, I cannot.
8      Q.  You received a demand letter --
9      A.  Right.
10     Q.  -- somewhere from December 31st on, and
11  it's a couple of days, right?
12     A.  Correct.
13     Q.  That letter demanded, for one part, that
14  you take the photograph off your website, right?
15     A.  Correct.
16     Q.  So do you believe that Mr. Harrington
17  knowingly allowed the photograph to be on your
18  website?
19     A.  No.
20     Q.  Okay.  So what makes you think that
21  Mr. Harrington has knowingly allowed the photograph
22  to be published on any other website without
23  attribution to himself?
24     A.  I can't attest to Mr. Harrington's
25  mindset.  I just know we found the photograph on the

142

1  internet.
2      Q.  Ms. Adler --
3      A.  Yes.
4      Q.  -- you surely are attesting to his
5  mindset.  Read paragraph nine.  You're making it --
6  you, not your lawyer.  And I need you to understand
7  this.  This is your complaint.
8      A.  Okay.
9      Q.  It's not your lawyer's fanciful
10 imagination.  This is your complaint and your
11 allegation.
12     MR. SQUIRES:  Drafted by -- but drafted by
13 her lawyer.
14     MR. DeSOUZA:  Yeah, and it's a judicial
15 admission against herself, and you know that.
16     MR. SQUIRES:  I don't know what you're
17 talking about.
18     MR. DeSOUZA:  That's great.
19     Q.  (By Mr. DeSouza) Ms. Adler, you are making
20 the allegation that Harrington knowingly allowed his
21 photographs to be available to the public on
22 websites without any claim that he owns the
23 photograph.  You're stating he knowingly did that.
24 What's your evidence that he knowingly did that?
25     A.  The only --

143

1      Q.  You don't have any, do you?
2      A.  The only evidence I have is we found the
3  picture on a website that didn't have a watermark or
4  said belonging to Blaine Harrington.
5      Q.  You found it on a website but can't tell
6  me today, right?
7      MR. SQUIRES:  She's answered your
8  question, Dan.  Go on to the next question.
9      MR. DeSOUZA:  Jeff, why don't you get a
10 glass of water or something.  Make yourself useful
11 besides interjecting.
12     Q.  (By Mr. DeSouza) Ms. Adler, you don't know
13 the website it was found on, so you don't know
14 whether there was any evidence that Mr. Harrington
15 owned the photo, right?
16     A.  There wasn't anything on the website that
17 alluded to the fact that Mr. Harrington owned the
18 photograph.
19     Q.  Let's assume that's true.
20     A.  Okay.
21     Q.  How can you possibly say that he knowingly
22 allowed his photograph to be on that website?
23 Knowingly.  That's your word.  Knowingly.
24     You don't have any evidence.  You don't
25 have any evidence whatsoever that he knowingly

144

1  allowed his photograph to be on that website,
2  correct?
3      A.  I guess that's correct.
4      Q.  Okay.  So why are you making this bold
5  assertion that he knowingly allowed it if you don't
6  have any evidence?
7      MR. SQUIRES:  She's testified to what
8  evidence she has.
9      MR. DeSOUZA:  I --
10     MR. SQUIRES:  No, because --
11     MR. DeSOUZA:  I don't care what you have
12 to say.  You're not going to testify for her.
13     MR. SQUIRES:  I know you don't care, Dan,
14 but I'm going to make statement, and then I'll be
15 done with it.
16     MR. DeSOUZA:  No, you're not.  You are not
17 going to make a statement.  I have a pending
18 question.  You are absolutely not going to testify
19 for your witness.
20     MR. SQUIRES:  She's answered your
21 question, and I'm going --
22     MR. DeSOUZA:  No, she hasn't.
23     MR. SQUIRES:  She has answered your
24 question.  She's answered it four times, and I'm
25 going to state, and then you can ask it again if you

145

1  want.
2      MR. DeSOUZA:  You are going to pay my
3  attorney's fees for your attorney's conduct.
4      MR. SQUIRES:  Adler Medical, like all the
5  Plaintiffs in this lawsuit, has relied on its
6  counsel's knowledge of facts that were not
7  necessarily known to Adler Medical at the time, and
8  that is the reason, and you can do with that as you
9  wish.
10     MR. DeSOUZA:  So you're the fact witness
11 now, Jeff?
12     MR. SQUIRES:  No.  Mr. Harrington will be
13 the fact witness, and the record of things not
14 within the direct knowledge of Adler Medical or any
15 of the other Plaintiffs but the records in the case,
16 not requiring the testimony of Adler Medical, will
17 prove the case.
18     MR. DeSOUZA:  Okay.
19     Q.  (By Mr. DeSouza) So, Ms. Adler, do you
20 have any evidence whatsoever that Harrington
21 knowingly allowed his photographs to be on any
22 website other than what you have perhaps learned
23 from your attorney?
24     MR. SQUIRES:  And what she's testified to
25 here, right?

146

1    MR. DeSOUZA: I don't care. Let her
2  answer a question. Stop telling me what she's
3  testified to.
4    Q.  (By Mr. DeSouza) Ms. Adler, can you answer
5  my question without your attorney chiming in? Is it
6  possible?
7    A.  I don't think so.
8    Q.  Do you have any knowledge whatsoever on
9  this point other than relying on your attorney as a
10 fact witness?
11   MR. SQUIRES: Objection as to form.
12 Foundation.
13   Q.  You can answer the question.
14   MR. SQUIRES: This is a simple question.
15 Stop making it complicated. He's making it
16 complicated.
17   Do you, not -- do you, within your
18 knowledge, know about the facts about Harrington's
19 conduct?
20   THE WITNESS: No.
21   MR. SQUIRES: Okay.
22   Q.  (By Mr. DeSouza) And by you, just to
23 clarify, you're not Michelle Adler today. You are
24 Adler Medical.
25   MR. SQUIRES: No, she's Michelle Adler,

147

1  but her testimony is binding on Adler Medical. So
2  when you say you to her, you're talking you to
3  Michelle Adler, but her testimony is binding on
4  Adler Medical. We understand that.
5    Q.  You understand that, correct, Ms. Adler?
6    A.  Yes.
7    Q.  Okay. Ms. Adler, we looked at the Google
8  search results. We spent a lot of time with them.
9  The one photograph that we saw on two different
10 search results clearly indicated Mr. Harrington as
11 the photographer, correct?
12   A.  Correct.
13   Q.  It clearly included a copyright notice
14 right there with the photograph, correct?
15   A.  Correct.
16   Q.  Can you point me to any evidence
17 whatsoever that the photograph that Ethan Adler
18 copied and displayed on your website did not come
19 from that site?
20   A.  This site is copyrighted. The one Ethan
21 got the picture from is not.
22   Q.  I'm sorry. There's construction on next
23 door. I didn't hear you, Ms. Adler.
24   A.  Your site is copyrighted. The picture
25 that we got, there's no watermarks or copyrighted

148

1  information on it.
2    Q.  Well, there's no watermarks on the site I
3  pulled up on Google.
4    A.  There's --
5    MR. SQUIRES: That's not a question.
6  Don't answer unless there's a question.
7    THE WITNESS: Okay.
8    Q.  Ms. Adler, you saw the photograph that was
9  in the Google search result. There was no watermark
10 on the photograph, correct?
11   A.  Correct.
12   Q.  Okay. There was no watermark on the
13 photograph that Ethan Adler found when he did his
14 search?
15   A.  And I said there was no copyrighted
16 information either.
17   Q.  You don't know what website it was, right?
18   MR. SQUIRES: Asked and answered ten
19 times.
20   Q.  You don't know, do you?
21   A.  No.
22   Q.  Okay.
23   A.  I don't remember the website, no.
24   Q.  Let's look at paragraph 11, Ms. Adler.
25   MR. SQUIRES: Read it carefully.

149

1    Q.  I'm going to have you focus on this first
2  part, but you can read the whole paragraph. Okay?
3    (Discussion off the record.)
4    A.  Okay.
5    Q.  Okay. Now, focusing on the part that's
6  highlighted in yellow, do you really believe that
7  Harrington is luring individuals into downloading
8  his photographs? Is that what you believe?
9    A.  Yes.
10   Q.  Did he lure you into downloading this
11 photograph, or did he lure Ethan into downloading
12 this photograph?
13   A.  The photograph was there, Mr. DeSouza. It
14 was just there.
15   Q.  Well, there's a difference between a
16 photograph being there and Mr. Harrington luring
17 someone into downloading the photograph. Wouldn't
18 you agree?
19   A.  True.
20   Q.  You said not true?
21   A.  I said true.
22   Q.  Okay. Well, tell me how he lured you --
23 tell me how he lured Adler Medical into downloading
24 this photograph. What evidence do you have that he
25 tried to lure you into downloading this photograph?

150

1        A. All I know, the picture was there.
2   There's nothing identifying the picture as being
3   copyrighted, and we downloaded the picture.
4        Q. Okay. Here's what I think.
5        A. Okay.
6        Q. Tell me if I'm wrong.
7        A. Okay.
8        Q. I don't think you have any evidence
9   whatsoever that Harrington took some affirmative
10  action into luring you to download a photograph.
11  You tell me if I'm wrong.
12        MR. SQUIRES: Tell him he's wrong.
13        A. You're wrong.
14        MR. DeSOUZA: I'm sorry. Jeff, did you
15  say, tell him he's wrong?
16        MR. SQUIRES: I said he's wrong.
17        MR. DeSOUZA: So you just suggested an
18  answer to your client under your breath that's
19  picked up on the record, correct?
20        MR. SQUIRES: Sure.
21        MR. DeSOUZA: Do you think that's
22  appropriate?
23        MR. SQUIRES: Probably not, Dan. But I
24  don't think any of this questioning is appropriate
25  or necessary for all the reasons I've said. You're

151

1   badgering the witness --
2        MR. DeSOUZA: Jeff, you are just putting
3   words in your client's mouth. Do you have any idea
4   how inappropriate that is?
5        MR. SQUIRES: She just testified before
6   that yes to your question. She believed he is
7   luring the witnesses. She explained in the
8   questioning before that that she was depending upon
9   the knowledge of her lawyer who drafted this and
10  stands behind it.
11        MR. DeSOUZA: Why don't you keep going,
12  Jeff? I mean, just keep giving me all of your
13  testimony.
14        Q. (By Mr. DeSouza) Ms. Adler --
15        A. Yes.
16        Q. -- without taking advice or without taking
17  answers from your lawyer, which frankly is appalling
18  that he's doing this, I need you to answer my
19  question.
20        MR. SQUIRES: Answer his question.
21        Q. Can we try that, please?
22        A. What was the question again?
23        Q. Okay. I'm going to ask a different
24  question. What evidence, if any, do you have that
25  Mr. Harrington lured you into downloading this

152

1   photograph?
2        A. I'm going to depend on the knowledge of my
3   attorney for this one --
4        Q. You can't.
5        A. In addition --
6        Q. You --
7        A. In addition --
8        MR. SQUIRES: Let her finish.
9        A. In addition, we did a website search. We
10  found the picture. There was nothing identifying
11  that the picture wasn't free.
12        Q. What does the latter part of that have to
13  do with Mr. Harrington luring you? There could be a
14  website out there --
15        A. If it was --
16        Q. There was -- hold on. Hold on. I know
17  it's hard on Zoom.
18        A. Go ahead.
19        Q. You told me you don't have any evidence
20  that Mr. Harrington even knew the photograph was on
21  whatever website Ethan downloaded it from, correct?
22        A. Correct.
23        Q. If he doesn't even know the photograph is
24  there, how can you, in good conscience, say that he
25  lured you into downloading it? If you don't know

153

1   whether he knew the photo was there in the first
2   place, how can you possibly say he lured you into
3   downloading it?
4        A. I don't know, Mr. DeSouza. We landed on
5   his photograph, and here we are.
6        Q. Okay.
7        THE COURT REPORTER: Hang on. Can we take
8   a minute? Somebody just walked in.
9        MR. SQUIRES: Your next witnesses are here
10  waiting. That's why.
11        (Recess was taken from 12:33 to 12:34.)
12        Q. (By Mr. DeSouza) Ms. Adler, you said you
13  deferred to your lawyer, relied on your lawyer.
14  Other than your lawyer -- okay. So put your lawyer
15  out of this for a moment. Other than relying on
16  your lawyer, you don't have any evidence you can
17  point me to that Harrington is luring you or anyone
18  else into downloading his photographs, correct?
19        A. Hold on a second. Is there -- can I
20  confer with him for a few minutes?
21        MR. SQUIRES: She wants to consult with
22  me.
23        Q. I can't do that, because we have a pending
24  question, Ms. Adler. I need you to answer the
25  question, and then you can consult.

154

1    MR. SQUIRES:  That's right.  That's right.
2    A.  As far as I know, it's just what happened
3  to us --
4    Q.  Well, I mean --
5    A.  -- and the other Plaintiffs in this
6  lawsuit for the same thing.  That's all I can attest
7  to right now.
8    Q.  Well, does that mean that Harrington lured
9  you into downloading his photographs?  So they just
10  happened to find that you and everybody else was
11  using his photographs?
12    MR. SQUIRES:  She answered your question.
13  She'd like to consult with me.  Can she consult with
14  me?
15    MR. DeSOUZA:  Sure.
16    (Recess was taken from 12:35 to 12:36.)
17    A.  Okay.  Mr. DeSouza, could you repeat your
18  question, please.  Thank you.  I appreciate it.
19    Q.  Sure.  You said other than the fact that
20  Harrington came after you, sent you a demand letter,
21  and sent similar demand letters to the other
22  Plaintiffs in this case, correct?
23    A.  Correct.  In addition to the numerous
24  cases Mr. Harrington has here in New Mexico that has
25  a similar pattern.

155

1    Q.  Okay.  And --
2    A.  Lots of cases, Mr. DeSouza.
3    Q.  Does the fact that Mr. Harrington has
4  filed a lot of cases, does that have anything to do
5  with whether he lured into someone into downloading
6  his photographs?
7    A.  Yes, because the similar issues are so
8  identical.
9    Q.  I'm sorry, what?  The circumstances are
10  identical?
11    A.  Yes.
12    Q.  Okay.  But you have no idea what website
13  or anybody else -- Jeffrey's going to jump up, but
14  you don't know what website or from where any other
15  person that Mr. Harrington has sued got their photo
16  from, do you?
17    A.  Not aware of that.  I am just aware of
18  the -- that we got ours from a website, and there
19  was no copyrighted information on it.
20    Q.  Let me ask you this.
21    A.  Sure.
22    Q.  If somebody Mr. Harrington has sued got
23  the photo from his website or downloaded it from one
24  of those Google search results we were just looking
25  at that has his name and his copyright information

156

1  on it, you still think he would have lured that
2  person into downloading his photo?
3    MR. SQUIRES:  Objection.  Form and
4  foundation.
5    A.  Completely different scenario,
6  Mr. DeSouza.
7    Q.  You haven't talked to these other people,
8  have you?
9    A.  No.
10    Q.  Of the 100 other lawsuits that he's filed,
11  have you talked to a single one of the defendants
12  that was involved in those lawsuits?
13    A.  No.
14    Q.  Of the 100 lawsuits he's filed, besides
15  this one, do you know where any of the defendants
16  got the photo from at issue?
17    A.  No.
18    Q.  So you don't know whether in 100 of 100
19  cases they went to Mr. Harrington's website and
20  decided to download the photograph directly from his
21  website?
22    A.  No.
23    Q.  You can't say he's luring all those other
24  people to download his photos, can you?
25    MR. SQUIRES:  Objection.  Form and

157

1  foundation.  She can say it.  She has said it by
2  alleging it in the complaint in reliance on her
3  lawyer, which has placed in the record.
4    Q.  Ms. Adler, can you answer your own
5  question without Mr. Squires chiming in?  Is it
6  possible?
7    A.  I'll be relying on Mr. Squires for this,
8  Mr. DeSouza.
9    Q.  Let me make this easy.
10    A.  Okay.
11    Q.  The factual allegations that you make
12  against Mr. Harrington in this complaint, are you
13  relying on Mr. Squires for the accuracy of those
14  allegations?
15    A.  Mr. Squires is my attorney, and I rely on
16  him for all the legalese.
17    Q.  I'm not talking about legalese.  This is a
18  factual allegation.  You understand the difference
19  between factual and legalese, right?
20    A.  Yes, I do.  I'll still be leaning on
21  Mr. Squires for that.
22    Q.  Other than -- other than Mr. Squires --
23    A.  Yes.
24    Q.  -- do you have any independent evidence
25  that Mr. Harrington is luring anyone into

178

1 witnesses to answer questions about attorneys fees,
2 would Mr. DeSouza withdraw his motion to compel,
3 which is how much have you paid toward your
4 attorney's fees? It asked for. We supplemented
5 whenever there was an additional payment made by
6 each of the four clients, how they made the
7 payments. None of those things are relevant, Your
8 Honor, and they should not be discoverable, because
9 they are, A, burdensome, and B, pointless.
10      THE COURT: No, I'm -- no. I'm ordering
11 that the questions that Mr. DeSouza has put forth to
12 me today, whether the attorneys fees -- what has
13 been incurred and what has been paid, that your
14 client has to answer those questions. But obviously
15 you may preserve your objections. You may object,
16 but then an answer, so that protects you in the
17 sense that if at -- if Mr. DeSouza attempts to enter
18 this information at trial, you can object that it's
19 irrelevant, it's -- you know, whatever your
20 objections are. You can preserve those objections.
21 Your client has indicated -- and it's a woman,
22 right?
23      MR. DeSOUZA: A corporate rep. She's a
24 woman, yes.
25      THE COURT: -- that she knows the answer

179

1 to the question, and she can answer it. It's not a
2 communication; therefore, it's not attorney-client
3 privilege, and so I will order her to answer.
4      The motion to compel is different. It has
5 to do with documents, and again, we'll deal with
6 that on August ?... But you preserve -- I mean,
7 that's the natu... ...se depositions, and you
8 being able to st...... ...ur objection, but then she's
9 permitt... ...nle.s it's something like a
10 privilege ques...n.
11      So you preserve your objection. You can
12 still object to it being introduced at trial, but
13 it's definitely within the scope of the note of the
14 30(b)(6) notice. It's within the scope of the
15 damages that you've asserted, and it seems to me --
16 I mean, I will agree. I mean, even in fee-shifting
17 cases where it's just a matter of one side versus
18 the other being able to shift the fees, the
19 amount -- certainly the incursion of attorneys fees
20 is always relevant. Whether or not it's been paid
21 might be a different question, but I think at this
22 point she can answer that question, and you can
23 preserve your objection.
24      MR. SQUIRES: All right.
25      THE COURT: All right. Anything else?

180

1      MR. SQUIRES: That's it.
2      MR. DeSOUZA: That's all from us, Your
3 Honor. Thank you.
4      THE COURT: All right. Thank you. Have a
5 good rest of your afternoon.
6      MR. SQUIRES: Dan?
7      MR. DeSOUZA: Yes, sir.
8      MR. SQUIRES: I have this other client
9 ready. When? Can you --
10      MR. DeSOUZA: Soon.
11      THE COURT REPORTER: Can we take a break?
12      (Recess was taken from 1:15 to 1:20.)
13      Q. (By Mr. DeSouza) Ms. Adler, did you have
14 any discussions in the hallway with the other
15 witnesses that are here to testify, the NM CCIM
16 folks?
17      A. No.
18      Q. Did you have any discussions with your
19 attorney while we were in the hallway?
20      A. Yes.
21      Q. Did you discuss the judge's ruling on the
22 discovery issue that we just brought up?
23      A. Yes.
24      Q. Did your attorney inform you that you're
25 going to have to testify about the amount of damages

181

1 you're seeking or the amount of fees that you have
2 incurred or paid?
3      A. Yes.
4      Q. Okay. Did your attorney suggest in any
5 way how you should answer those questions?
6      A. No.
7      Q. Ms. Adler, earlier today I asked you do
8 you know how much you have paid in total in fees and
9 costs with respect to this lawsuit. You said yes.
10 I asked you how much. Mr. Squires instructed you
11 not to answer. I'll ask you same question now. How
12 much in fees and costs have you paid to date to
13 Mr. Squires, Peacock Law, his new law firm in total?
14      A. I don't know the exact amount.
15      Q. Okay. Well, how about the rough amount?
16      A. Approximately six to 7,000.
17      Q. Does that mean you have not paid in full
18 the amount paid to Peacock Law in 2022?
19      A. Correct.
20      Q. Did Peacock Law issue additional invoices
21 to Adler Medical beyond the three that we looked at
22 earlier?
23      A. I don't remember.
24      MR. SQUIRES: I'll stipulate that it has.
25      Q. Okay. If you haven't paid in full the

**182**

1   third one we looked at, is it fair to assume any
2   additional invoices issued to Peacock Law you have
3   not paid any money towards?
4       A. Correct.
5       Q. When was the last time you recall making a
6   payment to Peacock Law, Mr. Squires, or his new law
7   firm?
8       A. March, April -- I think it's either March
9   or April, to the best of my recollection.
10      Q. And I think you said -- it was hours ago,
11  but I think you said Mr. Squires has not issued any
12  invoices to Adler Medical yet, correct?
13      A. Correct.
14      Q. So you said you think you owe
15  approximately six to 7,000 to Peacock Law; is that
16  right?
17          MR. SQUIRES: That's not what she
18  testified. Objection. Form and foundation.
19          MR. DeSOUZA: I may have misheard it. Is
20  that what you think you paid or what you think you
21  still owe?
22      A. Paid.
23      Q. I'm sorry. Do you have a rough idea how
24  much you think you still owe?
25      A. Approximately 4,500 to Peacock Law.

**183**

1       Q. Do you intend to pay that to Peacock Law?
2       A. Yes.
3       Q. Has Peacock Law issued any requests for
4   demands for payment in that amount?
5       A. No.
6       Q. You haven't received any letter, like,
7   "pay up, otherwise we're going to sue you" type of
8   thing?
9       A. No.
10      Q. Do you have a payment plan or anything
11  worked out with Peacock Law regarding any amounts
12  still owed to it?
13      A. No.
14      Q. There's an allegation in this lawsuit that
15  Mr. Harrington has made exorbitant or extortion
16  demands to various people, including Adler Medical.
17  Are you familiar with that?
18      A. Yes.
19      Q. I'm assuming you believe the $30,000
20  number that was in Mr. Harrington's initial demand
21  letter is both exorbitant and extortionate; is that
22  right?
23      A. Yes.
24      Q. Do you have an understanding what amount
25  Mr. Harrington should have demanded from Adler

**184**

1   Medical such that you would not have considered it
2   to be exorbitant or extortionate?
3       A. Yes.
4       Q. How much?
5       A. 2,500.
6       Q. Okay. What leads you to that conclusion?
7       A. Because it's a picture, and it was a
8   scrolling picture, and that's just my opinion.
9       Q. Well, again, I'm just trying to figure out
10  if it's just an opinion that you have or if it's
11  based on something.
12          MR. SQUIRES: Is there a question? Is
13  there a question?
14      Q. I think I just asked her.
15          MR. SQUIRES: No. You said you were
16  trying to figure something out. If you have a
17  question, ask her a question.
18          MR. DeSOUZA: I appreciate the help, Jeff.
19      Q. (By Mr. DeSouza) Ms. Adler, the $2,500
20  that you suggested, is that based on any type of
21  research, any type of understanding of copyright
22  law, or is it just some personal opinion you think
23  that's the number he should have asked for?
24      A. Just a personal opinion.
25      Q. Okay. Are you aware -- have you had a

**185**

1   chance to look at the statute governing copyright
2   damages that provides for statutory damages in the
3   case of nonwillful infringement a court can award
4   between seven $50 and $30,000? Are you familiar
5   with that?
6       A. I believe that was in your letter to us.
7       Q. Okay. Have you ever had a chance to look
8   at that statute yourself --
9       A. No.
10      Q. -- beyond just looking at the letter?
11      A. No.
12      Q. As you sit here today, do you have an
13  understanding that if a court finds your
14  infringement to be not willful, the court has the
15  power to award up to $30,000 of statutory damages
16  for the violation at issue with respect to Adler
17  Medical?
18          MR. SQUIRES: Objection. Form and
19  foundation.
20      A. Yes.
21      Q. Did you have an understanding that if the
22  court finds your infringement to be -- assuming
23  there's infringement. I don't want to, you know,
24  assume before.
25          Assuming the court finds in favor of